UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL HAZE LEDFORD,                          CASE NO. 20-CV-12719

          *Plaintiff*,                      HON. JUDITH E. LEVY
*v.*                                        DISTRICT JUDGE

COMISSIONER OF SOCIAL                       HON. PATRICIA T. MORRIS
SECURITY,                                   MAGISTRATE JUDGE

          *Defendant*.
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 19, 21)

### I.    RECOMMENDATION

Plaintiff Paul Ledford challenges the Commissioner of Social Security regarding a final decision denying his application for Social Security Income ("SSI"). The case was referred to the undersigned for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 19, 20)[1], **GRANTING** the Commissioner's Motion for Summary Judgment, (ECF No. 21), and affirming the decision.

---

[1] Plaintiff filed a motion for summary judgment (ECF No. 19) and a "cross motion" for summary judgment (ECF No. 20)—the undersigned analyzes both documents, together, as Plaintiff's complete motion, and will refer to his motion using the ECF No. 19 document.

## II.   <u>REPORT</u>

### A.  Introduction and Procedural History

Plaintiff protectively filed an application for SSI on March 14, 2017. (ECF No. 16, PageID.110, 222.) His alleged onset date was April 10, 2006. (ECF No. 16, PageID.318.)[2] On February 19, 2019, after a hearing, an administrative law judge ("ALJ") denied Plaintiff's claim. (ECF No. 16, PageID.120.) The Appeals Council ("AC") denied review and Plaintiff sought judicial review on September 24, 2020. (ECF No. 16, PageID.71; ECF No. 1.)

The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 19, 20, 21.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as

---

[2] Another document in the record lists Plaintiff's alleged onset date of February 5, 2005. (ECF No. 16, PageID.320.)

adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

3

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 16, PageID.120.) At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since March 14, 2017, the application date. (*Id*. at PageID.112.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: bipolar disorder, attention deficit hyperactivity disorder, and substance abuse disorder. (*Id*.) The ALJ found several nonsevere impairments, including hepatitis C, migraine, and "unspecified psychosis." (*Id*. at PageID.113.)

The ALJ found that none of these impairments met or medically equaled a listed impairment at step three. (*Id.* at PageID.114-15.)

Next, the ALJ found that Plaintiff had the residual functional capacity ("RFC"):

> [t]o perform a full range of work at all exertion levels but with the following nonexertional limitations: limited to simple routine work not done at a production rate pace, can interact with and react appropriately to supervisors and coworkers on an occasional basis, and limited to no more than superficial interactions with the general public.

(*Id*. at PageID.115.) At step four, the ALJ found that Plaintiff had no past relevant work to consider. (*Id.* at PageID.119.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including bagger, copy machine operator, and package sorter. (*Id.* at PageID.119-20.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.120.)

### E.  Administrative Record

#### i.        Plaintiff's Testimony at the Administrative Hearing

A hearing was held on November 15, 2018 before an ALJ. (ECF No. 16, PageID.126-27.) Counsel for Plaintiff spoke first, briefly, and relayed a quick history of Plaintiff's recent circumstances. "[Plaintiff] was in prison. That's when his benefits were ceased, obviously." (*Id*. at PageID.131.) Counsel continued, "since he got out [of prison], he's had some problems in terms of getting back into treatment." (*Id*. at PageID.132.) Apparently, Plaintiff was seeing a Dr. Witt, but treatment was "spotty" due to Plaintiff's "transportation issues and where he's been living." (*Id*.) Counsel stated that she did not believe Plaintiff's bipolar disorder was under control or properly treated and that his "hospitalizations, this year, are an indication that he's either not been taking his medicine, or the medicine has not been helping him." (*Id*.)

The ALJ questioned Plaintiff. (*Id*. at PageID.134.) The ALJ asked Plaintiff whether he was working, and Plaintiff responded "no." (*Id*.) Plaintiff stated that his last employment was at a car wash, "selling newspapers." (*Id*. at PageID.135.) Plaintiff clarified that this employment ended when he was incarcerated. (*Id*.) The ALJ asked Plaintiff about his incarceration. Plaintiff seemed to be unsure whether his conviction was ultimately overturned—the ALJ stated "obviously [a conviction being overturned] is relevant. Because it appears that, at least, in part, the reason [his benefits were] discontinued, in the first place, was because of the incarceration." (*Id*. at PageID.137.) Plaintiff's counsel confirmed that "I have no reason to believe that he wasn't incarcerated and it was convicted. It was not overturned, in my understanding." (*Id*.)

The ALJ asked Plaintiff why he hasn't been able to work since his release from prison. (*Id*.) Plaintiff responded, "I suffer from severe fibromyalgia. Which I've been on meds since I got out, for my fibro, called Cymbalta, through Dr. Gloria Witt." (*Id*.) Plaintiff continued, "[a]nd I also have severe hallucinations, which this mental health in Northern Lakes, that I'm going to now, I've been describing them the last few visits I've been there." (*Id*.) He stated, "both of those things is [sic] what my major ailments are, that slow me down and stop me[.]" (*Id*.)

Plaintiff discussed his ailments further. He stated that he began experiencing pain from his fibromyalgia when he was in prison, but stated, "if I would've got on any meds in prison, I wouldn't have been about to go to boot camp[.]" (*Id.* at PageID.138.) Plaintiff explained that the "boot camp" was "a paramilitary camp. Only like 250 people make it, out of 500, by a 90-day period of hell. It's pretty drilling. But I earned a bunch of certificates in there . . . just to brush up on knowledge[.]" (*Id*.) The ALJ asked, "if your fibromyalgia is so bad that you can't work, how were you able to complete boot camp?" (*Id.* at PageID.139.) Plaintiff responded, "[h]ad to preserve through it. I almost failed, so many times over, it was unreal. But if you don't make it, you're pretty much stuck in prison. And it [kind of] drives you[.]" (*Id*.) The ALJ asked whether the boot camp involved "having you run and go through obstacle courses[.]" (*Id*.) Plaintiff confirmed that it did, and elaborated, "[t]he first month, it's like mental stuff. They teach you how to do all the stuff. Like folding your t-shirts and have you make your bed just right[.]" (*Id*.) Then, Plaintiff explained, "five days out of the week you [have to] jog [] I think, two to four miles, something like that, every single day, for four days." (*Id*.) Further, "you're doing

sit-ups, even, like will kick you in the chest, push you back down." (*Id*.) Plaintiff made it through 89 days but did not complete the boot camp. (*Id*. at PageID.140.) Some of the certificates that Plaintiff earned included computer skills and money management. (*Id*. at PageID.141.)

The ALJ asked Plaintiff about his fibromyalgia. (*Id*.) Plaintiff stated that the doctors at "Stonecrest psych ward" increased his Cymbalta prescription, as well as his Seroquel prescription and his medicine for ADHD. (*Id*. at PageID.142.) However, even with the higher dosage of medication, Plaintiff testified that he is still "in severe pain every day" and experiences "muscle cramps, [] [easy] bruising, and inflammation." (*Id*.) He stated that he can't hold a jug of milk or comb his hair because his hand cramps up. (*Id*. at PageID.142-43.) The ALJ asked, "if your condition is to the point that you can't even comb your hair or hold a pail of milk, how were you able to complete boot camp?" (*Id*. at PageID.143.) Plaintiff responded that he "tried to blend in with everybody else" and had to "psych [himself] out to saying it's just one more day to go and one more day down." (*Id*.)

Next, the ALJ questioned Plaintiff about his hallucinations. (*Id*.) Plaintiff stated that the hallucinations started when he began taking a medication for anxiety prescribed by Dr. Witt, but when he stopped taking the medication, the hallucinations only happen occasionally. (*Id*.) Plaintiff could not remember the name of the anxiety medication. (*Id*.) Plaintiff described his hallucinations as "I'll think [] there's somebody running up on me, [] and it could just be my shadow. Or like I might see a picture that's still, but yet its moving, [kind of], a little bit. . . . Or like maybe I'm walking down the road, to go try to play some basketball, or something for physical therapy. Like I can look to my left, and

I'll see something that [isn't] there. And its like something just running off. But it [isn't] really there." (*Id.* at PageID.144.) The ALJ noted that records did not exist for much of Plaintiff's mental health medical treatment—the ALJ asked Plaintiff to describe his treatment in lieu of the records. (*Id.* at PageID.145.) Six months prior to the hearing, Plaintiff attended Pine Rest Christian Mental Health Services to get "evaluated." (*Id.*) Plaintiff could not articulate why he went there in the first instance—he stated only that he went to a primary care doctor with his mother to discuss his fibromyalgia, then said "my mom started telling [the doctor] all kinds of stuff about me . . . telling her that I was [] hallucinating and schizophrenic . . . then, after that, they took me to that psych ward." (*Id.* at PageID.146.) From September to October, Plaintiff was at "Stonecrest." (Id. at PageID.147.) A week before the hearing, Plaintiff stayed at an inpatient facility in Grayling. (*Id.* at PageID.148.)

The ALJ asked Plaintiff about his ADHD. (*Id.* at PageID.150.) Plaintiff testified that a Dr. Terry Dickson prescribed him medication for ADHD. (*Id.*) Plaintiff stated he has been seeing Dr. Dickson for over a year and the medication "definitely" helps him. (*Id.*)

Next, Plaintiff's attorney questioned him. (*Id.* at PageID.152.) Counsel asked Plaintiff if he had trouble controlling his emotions, or if he gets angry or depressed. (*Id.*) Plaintiff responded that he sometimes breaks things when he is feeling angry: "I've broke [sic] like three different tables and a corner off my laptop. But it takes me like a quick second to release, and then I'm done. But it's my own property. I mean, to where I'm not harming [anybody]." (*Id.*) When Plaintiff takes his ADHD medication, he can focus more, for example, when he does "art work or working on graphics" he can finish "the entire

picture" rather than his "mind being all over the place." (*Id.*) Plaintiff stated that he still suffers from hallucinations occasionally and experienced them about three or four times that month. (*Id.* at PageID.153.) Plaintiff stated that these hallucinations make him scared to be in public and said he "could walk in front or traffic" when he is experiencing a hallucination. (*Id.* at PageID.162.)

> ii.     **The Vocational Expert's Testimony at the Administrative Hearing**

Next, the ALJ questioned the vocational expert (VE). (*Id.* at PageID.165-66.) The VE first confirmed that if he gave an answer that conflicted with or was inconsistent with the Dictionary of Occupational Titles (DOT) he would advise the ALJ and describe what formed the basis of his opinion. (*Id.* at PageID.166.) The ALJ then asked the VE to consider a hypothetical individual with the following limitations:

> Limited to light work, is further limited in that the individual cannot work on ladders, ropes, or scaffolds. They can occasionally use ramps and stairs. They can occasionally balance, stoop, crouch, crawl, and kneel. They can't work at unprotected heights or around dangerous machinery. They're limited to simple, routine work; not the production rate pace. They can interact with and react appropriately to supervisors and co-workers on an occasional basis; limited to no more than superficial interactions with the general public.

(Id. at PageID.167.) The ALJ asked whether the VE could describe any jobs that could be done by such an individual. (*Id.*) The VE responded that such an individual could perform the following jobs: bagger, DOT code 920.687-018, light work, 700,000 jobs; photocopy-machine operator, DOT code 207.685-014, light work, 54,900 jobs; and package sorter, DOT code 222.687-022, light work, 671,000 jobs. (*Id.*)

## F.  Governing Law

Because Plaintiff's application was filed before the newly promulgated regulations went into effect on March 27, 2017, the regulations in effect at the time of Plaintiff's application apply. *See Ross v. Berryhill*, No. 18-cv-0071, 2019 WL 7755930, at *6-8 (E.D. Tenn. Sept. 17, 2019). The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[3] carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d) (2016). Only "acceptable medical

---

[3] Various amendments have been made to the regulations since Plaintiff filed his claim. *See, e.g.*, Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). Because the changes do not alter the outcome here—and, relatedly, they do not appear to exercise an impermissible retroactive effect on Plaintiff's rights, as the amendments are largely procedural changes in the process for analyzing evidence, *cf. Combs v Comm'r of Soc. Sec.*, 459 F.3d 640, 647 (6th Cir. 2006)—and the parties do not discuss them, it is unnecessary to determine whether they apply. Therefore, like many other courts, I will utilize the regulations in effect when Plaintiff filed his claim and the case was decided by the ALJ, along with the new regulations that explicitly apply to claims during this period. *See, e.g.*, 20 C.F.R. § 404.1527; *see also Rodriguez v. Colvin*, 3:15CV1723, 2018 WL 4204436, at *4 n. 6 (D. Conn. 2018) ("[T]he Court reviews the ALJ's decision under the earlier regulations because the plaintiff's application was filed before the new regulations went into effect." (citing *Maloney v. Berryhill*, No. 16-cv-3899, 2018 WL 400772, at *1 (E.D. N.Y. 2018) (same))); *Miller v. Comm'r of Soc. Sec.*, No. 1:17CV0718, 2018 WL 2773372, at *5 n. 3 (N.D. Ohio 2018) ("Plaintiff's claim was filed before March 27, 2017, and the ALJ's decision was rendered before the new regulations took effect. For the sake of consistency, the court continues to cite the language from the former regulations that were in effect at the time of the ALJ's decision."), *Rep. & Rec. adopted by* 2018 WL 2766020 (N.D. Ohio 2018); *Woodall v. Berryhill*, No. 1:17-cv-01289, 2018 WL 3133442, at *7 n. 3 (N.D. Ohio 2018) (applying the rules effective when the claimant applied for benefits), *Rep. & Rec. adopted by* 2018 WL 3126552 (N.D. Ohio 2018); *Meeks v. Comm'r of Soc. Sec.*, No. 4:17-cv-45, 2018 WL 1952529, at *4 n. 2 (E.D. Tenn. 2018) (applying the rules effective when the ALJ decided the case). *See generally* Revisions to Rules Regarding the Evaluation of Medical Evidence, 81 Fed Reg. 62560, 62578 (September 9, 2016).

sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from her treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical

and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). The ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence

in the record and factors outlined in SSR 96-7p, 1996 WL 374186 (July 2, 1996).[4]

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.

*See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir.1987).

Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v.

Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating

subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996

WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by

confirming that objective medical evidence of the underlying condition exists. The ALJ

then determines whether that condition could reasonably be expected to produce the

alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20

C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v.

Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the

extent of the work-related limitations by determining the intensity, persistence, and limiting

effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of*

---

[4] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from
Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has
remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District
that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g.*, *Cooper v. Comm'r
of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted
by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL
2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July
7, 2017).

*Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R.§ 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

### G. Arguments and Analysis

#### i. Argument

Plaintiff appears before this Court *pro se*. Plaintiff argues, "I've been on these treatment plans for years now with my [] doctor JoAnn Haderer which I've documentation from her that states I can't or shouldn't work with my condition[.]" (ECF No. 19, PageID.742.)

In his Motion, Plaintiff describes his current employment as a "doordasher," wherein he delivers food from a restaurant to an individual's home. Plaintiff appears to perform this job "50/50" with someone else who drives the car, while Plaintiff gives directions. (ECF No. 19, PageID.742-44.) Plaintiff claims that he cannot do this job on his own because of his disabilities—he cannot drive the car, which is why he takes the passenger seat and helps with directions. (ECF No. 19, PageID.742-43.)

It is unclear exactly what Plaintiff is requesting of this Court—he asks, "I'm asking may we do doordashing with teamwork . . . but we want to know if SSI or the courts will allow us to partially work what [we're] capable of . . ." (ECF No. 19, PageID.743) and "I just want to know if we can start doing doordash [together] & still received our government assistance for our severe disabilities . . .." (ECF No. 19, PageID.743-44.) Plaintiff writes that he "became top dasher status just a little over a few days ago now our ratings are dropping until I get your court permission to do doordashing and still be qualified for government assistance because of severities . . .." (Id. at PageID.745-46.)

Plaintiff provides, "my disabilities keep me agitated because I suffer daily on all the issues that affect me sometimes all at the same times mostly all I can do is cry and be in severe pain with fibro and through my schizophrenia hearing voices and my mood swings cause of things happening to me and my ADHD med helps me calm down and focus on chores or artwork or difficult but easy when I was doing it for last [three] weeks . . .." (ECF No. 19, PageID.745.)

He describes other aspects of this employment: "I keep in contact with the customer like item not available what do you want to replace it with to like our ratings on doordash

app show the customer says I'm friendly and keep in communication every step of the way

. . . follow instructions sometimes they want handed the food or put it somewhere inside

like a porch . . . and I [have] to take a photo and leave a description where I left it . . .."

(ECF No. 19, PageID.743.)

In hopes of shedding more light on the grounds upon which Plaintiff brings his

claims, I look to his complaint. In his complaint, Plaintiff writes "I have a lawyer who

didn't turn in half my medical documents proving my disabilities like schizophrenia,

ADHD, fibromyalgia, chronic pain, learning disabled, emotionally unstable, unspecified

mood disorder, anxiety and depression." (ECF No. 1, PageID.3.) Plaintiff checks the box

that provides the Commissioner's decision was based on legal error but does not list any

specified legal errors. (ECF No. 1, PageID.4.) Plaintiff includes language that he is

requesting "review of hearing decision [through] SSI . . .." (ECF No. 1, PageID.6.)

It is unclear on precisely what grounds Plaintiff seeks summary judgment. In fact,

it appears, rather, that Plaintiff is simply asking this Court whether he can work while

receiving SSI benefits. However, Plaintiff was denied SSI benefits by the ALJ and Appeals

Council. In his reply to Defendant's response, Plaintiff writes that he is "willing to settle

out of court, instead of litigating the case through to the bitter end." (ECF No. 22,

PageID.772.)

Defendant presents argument based on substantial evidence, although Plaintiff does

not raise substantial evidence. Because Defendants argument is more specific, and

Plaintiff's does not seem to raise a particular issue with the ALJ's finding or analysis, the

undersigned elects to follow the organization of Defendant's Motion and address the arguments made therein.

First, Defendant argues that substantial evidence supported the ALJ's decision. (ECF No. 21, PageID.755.) Specifically, Defendant argues that the ALJ properly determined that Plaintiff's impairments did not meet or equal a listing, (*id*. at PageID.757), that the ALJ properly conclude Plaintiff could perform a range of unskilled work, (*id*. at PageID.761), and that the ALJ properly found Plaintiff could perform a significant number of jobs in the national economy. (*Id*. at PageID.765.) I address each argument in turn.

## ii.  Analysis

### a.  Plaintiff's impairments did not meet or equal a listing

The ALJ considered two listings in Plaintiff's case—listings 12.04 and 12.11. (ECF No. 16, PageID.114-15.) To satisfy these listings, plaintiff would need to show an "extreme limitation of one, or a marked limitation of two, of the following areas of mental functioning: [1] understand, remember or apply information; [2] interact with others; [3] concentrate, persist, or maintain pace; and [4] adapt or manage oneself." 20 C.F.R. Pt. 404, Supt. P, App'x 1 §§ 12.04(B), 12.11(B). Defendant notes that "[a]lthough listings 12.04 and 12.11 enumerate the same requirements in part B, they deal with different impairments in part A—12.04 with 'Depressive, bipolar and related disorders' and 12.11 with 'Neurodevelopmental disorders.' 20 C.F.R. Pt. 404, Supt. P, App'x 1 §§ 12.04(A), 12.11(A). Since there is no dispute that plaintiff's impairments satisfy part A of the listings,

the Commissioner addresses the listings collectively." (ECF No. 21, PageID.758, fn. 2.)

Indeed, Plaintiff does not dispute anything regarding Part A of these listings.

> The ALJ analyzed each of these four elements in his decision. First, the ALJ wrote,

> In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant's memory is generally noted to be within normal limits and his through processes to be logical and coherent (Ex. D2F/11 D6F/10; D9F4-5; D12F/9; D13F/20; D15F/4). At the consultative psychological examination, he could repeat [six] digits forwards and [three] digits backwards and could recall [two] of [three] items after a [three]-minute delay. (Ex. D9F/5).

Next, regarding the second element, the ALJ similarly found:

> In interacting with others, the claimant has a moderate limitation. The claimant demonstrates variable eye contact, is cooperative and friendly but evasive and guarded, has a noted history of substance abuse, and reported has [sic] emotional outbursts and suicidal threats when not compliant with treatment (Ex. D6F/10; D9F/3; D11F/6; D12F/8-9; D13F/7, 20; D15F/4).

Analyzing the third element, the ALJ then wrote:

> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant's attention and concentration range from normal to impaired and he has a history of treatment with Adderall for attention deficit hyperactivity disorder (Ex. D2F/30; D6F/10; D9F/4-5; D12F/8-9; D13F/20; D15F/4). He demonstrated slow pace and need to use his fingers for serial [sevens] at the consultative psychological examination (Ex. D9F/5; D12F/8).

And finally, the ALJ analyzed the fourth and last element:

> As for adapting or managing oneself, the claimant has experienced a mild limitation. The claimant's grooming and hygiene are generally within normal limits (Ex. D9F/4; D12F/9; D12F/20; D15F/4). His dress is normally unremarkable except for one evaluation in October 2018 when he was overdressed for the weather and clearly sweating (Ex. D13F/6-10). The record noted inconsistent treatment compliance, substance misuse, and some instances of emotional outbursts for [sic] suicidal threats (Ex. D12F; D13F; D15F).

So, the ALJ found that Plaintiff had a moderate limitation in three of the four categories, and a mild limitation in one category. The ALJ analyzed each element, individually, and cited to the record several times for each element to support his position. Indeed, the record cited by the ALJ does not indicate that he erred in finding only moderate and mild limitations: "[a] marked limitation may arise where several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F. 3d 647, 658 (6th Cir. 2009) (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04). There, the Sixth Circuit confirmed that a limitation was not marked where the plaintiff could clean, shop, cook, use public transportation, pay bills, maintain a residence, care for grooming and hygiene, use the telephone, and use a post office. *Id*. Here, Plaintiff provided in his Function Report that he could make microwave food for himself, shop for food, clothing, and personal hygiene products a few times a week for about an hour each time, he pays bills, counts change, handles a savings account, and uses a checkbook or money orders, and regularly visits church, food pantries, thrift shops, and doctors' appointments, although he needs someone to accompany him "most of the time." (ECF No. 16, PageID.358-64.) He provided that he gets along "very well, respectable" with authority figures. (*Id*. at PageID.364.)

I also note the record evidence cited by the ALJ. For example, Edward Czarnecki, Ph.D. reported that Plaintiff was either moderately limited or not significantly limited in his sustained concentration and persistence limitations (ECF No. 16, PageID.218-19), that

his hygiene was neat and clean, and that Plaintiff acknowledged his ability to do laundry, use public transportation, and shop. (*Id*. at PageID.217-18.) Twaide Langham, D.O., reported that Plaintiff "can follow spoken instructions but has problems with his memory [and] gets along very well with authority figures. (*Id*. at PageID.213.) Dr. Langham opined that the medical evidence did not establish a severe impairment such as would meet or equal a listing. (*Id*. at PageID.214.) A consultative examination by James L. Talbott, MS, noted that Plaintiff "related to this examiner in a quiet and compliant manner. He was pleasant and cooperative and willing to answer all questions during the interview." (ECF No. 16, PageID.587.) His clothing and hygiene were neat and clean and he "apparently needed no assistance in preparing for this session such as with showering or changing his clothes." (*Id*. at PageID.588.) His thoughts and speech were well-organized. (*Id*.)

Plaintiff provides a letter from a medical professional who he purports was treating him as an attachment to his Complaint—this letter from one JoAnn Haderer, DNP, provides: "[Plaintiff] is diagnosed with schizophrenia, anxiety and attention deficit disorder. These diseases are significant enough to interfere with his ability to be employed. In my opinion he would be a candidate for disability benefits." (ECF No. 1, PageID.14.) Further, a May 20, 2019 note, also attached to Plaintiff's Complaint, from Haderer provides: "safe to assume with combination of medical ailments should not return to work activities due to arising results of unpredictable behavior being treated for schizophrenia, and emotionally impaired, he is learning disabled, also has a moderate level of depression and anxiety. Expected to last more than 12 months even if medications improve patient." (ECF No. 1, PageID.23.) This letter does not appear to have made its way into the record—

as the ALJ was unable to consider this evidence, neither can the Court consider it here. *Defrank v. Colvin*, No. 15-cv-1473, 201 WL 3898441, at *5, fn. 45 (N.D. Oh. July 19, 2016) ("The Sixth Circuit has held that when a plaintiff submitted evidence to the Appeals Council that had not been in the record before the ALJ, a district court cannot consider it [. . .] The Sixth Circuit has also held that when a *pro se* applicant had legal representation at the time of the Appeals Council, and the attorney supplemented the record at that time, then a plaintiff's subsequent pro se status does not provide good cause [for the district court to remand to consider new evidence]. (first citing *Hollon ex rel Hollon v. Commissioner of Social Sec*., 447 F.3d 477, 485 (6th Cir. 2006) and then citing *Cline v. Commissioner of Social Sec*., 96 F.3d 146, 149 (6th Cir. 1996) ("Cline's lawyer elected to wait and submit the new evidence to the Appeals Council for the first time. This is clearly not good cause.")) Plaintiff was represented by council at the hearing before the ALJ, but appears now *pro se*. The denial from the Appeals Council was also sent to Plaintiff's former council in this matter, (ECF No. 16, PageID.74), suggesting that he was indeed represented up until the AC's denial.

In fact, the AC denial letter acknowledges the letter from Harderer, and notes that the AC did not consider it, even though it was submitted in support of Plaintiff's appeal, because it did not relate to the relevant treatment period. Indeed, the letter from Haderer is dated April 22, 2020, which is approximately one year *after* his hearing before the ALJ, which was on February 19, 2019. (ECF No. 1, PageID.14; *see also* ECF No. 16, PageID.72.) In short, the letter from Haderer did not exist at the time the ALJ reviewed

Plaintiff's medical history—thus the ALJ could not have reviewed it, and so neither can the Court review it now.

In conclusion, I recommend this Court find that the ALJ's decision that Plaintiff's disabilities did not meet or equal a medical listing was indeed supported by substantial evidence, and any challenge based on this finding should fail.

### b. Plaintiff's RFC and the ALJ finding that Plaintiff could perform a range of unskilled work

Next, Defendant argues that the ALJ properly defined Plaintiff's RFC and did not err in finding that there was a range of unskilled work available to Plaintiff.

The ALJ found that Plaintiff was able:

> To perform a full range of work at all exertion levels but with the following nonexertional limitations: limited to simple routine work not done at a production rate pace, can interact with and react appropriately to supervisors and coworkers on an occasional basis, and limited to no more than superficial interactions with the general public.

(ECF No. 16, PageID.115.) The ALJ again relied on the record evidence regarding the status of Plaintiff's mental health, noting that his clothing and hygiene were neat and clean, he spoke with spontaneous speech and had not though blocking or illogical statements, and was calm and cooperative at appointments. (ECF No. 16, PageID.116.) The ALJ did qualify Plaintiff's abilities by noting the evidence of Plaintiff's "emotional outbursts and suicidal threats when not compliant with treatment"—the ALJ limited Plaintiff's RFC, noting "[t]hese findings support the limitations to occasionally ability [sic] to appropriately interact and react to supervisors and coworkers and no more than superficial interactions with the public." (*Id*. at PageID.118.)

The ALJ assigned great weight to Czarnecki's opinion, which concluded that Plaintiff had no severe physical limitations—the ALJ emphasized that "the claimant's physical examinations are generally within normal limits and he testified that he was able to complete a very physically demanding boot camp program." (*Id*.) The ALJ gave only partial weight to the opinion of Langham, instead finding that Plaintiff was *more* limited in his mental health than Czarnecki concluded—this determination by the ALJ, of course, falls in favor of Plaintiff. (*Id*.) And finally, the ALJ assigned great weight to Talbott, the psychological consultative examiner, noting that this opinion found Plaintiff would be able to manage his own benefits if awarded and that he was "doubtful" to have ever had psychotic episodes; the ALJ concluded that the opinion was consistent with Plaintiff's "grossly normal mental status examinations prior to October 2018 and his improvement with consistent treatment." (*Id*. at PageID.118-19.)

The ALJ relied upon substantial evidence in reaching this conclusion. Plaintiff does not raise any issues in particular with the ALJ's analysis or his review of the record. Notably, the ALJ does not suggest that Plaintiff can work freely without any limitations— the ALJ qualifies the RFC with several social interaction limitations based on the evidence of any mental health issues that may arise for Plaintiff. The ALJ includes support for all of his conclusions and cites to record evidence. And if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip*, 25 F.3d at 286. I suggest that any challenge based on lack of substantial evidence in determining Plaintiff's RFC fails.

24

### c. A significant number of jobs exist in the national economy that Plaintiff could perform

Finally, Defendant argues that the ALJ properly determined that Plaintiff could perform a significant number of jobs in the national economy. Plaintiff does not seem to dispute this contention, as his Motion appears to seek the ability to receive benefits while continuing to work—Plaintiff details his current employment in the Motion. So, it is undisputed that Plaintiff can perform some work.

As to the specific jobs outlined by the ALJ, including bagger, copy machine operator, and package sorter, these options were offered by the VE during the hearing. As Defendant points out, "[a] vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). I recommend that the ALJ did not err in determining that a significant number of jobs, particularly the three aforementioned jobs, are available to Plaintiff.

### H. Conclusion

For these reasons, I recommend **DENYING** Plaintiff's motion, (ECF Nos. 19, 20), **GRANTING** Defendant's motion, (ECF No. 21), and affirming the decision.

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may

respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 30, 2021                     S/ PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge

26